UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**AMCOR FLEXIBLES NORTH AMERICA, INC.,**

    Plaintiff,

  v.

**REYNOLDS PACKAGING, LLC,**

    Defendant and Third-Party Plaintiff,

  v.                                                                                        Case No. 23-C-1306

**REYNOLDS PRESTO PRODUCTS INC.,**

    Third-Party Defendant,

  v.

**WEST BEND MUTUAL INSURANCE COMPANY,**

    Intervenor.

---

### DECISION AND ORDER DENYING WEST BEND MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Amcor Flexibles North America, Inc. (Amcor) brought this action against Defendant Reynolds Packaging, LLC (Reynolds), asserting claims arising out of Amcor's purchase from Reynolds of allegedly defective zippered, food-storage pouches. Reynolds then filed a third-party complaint against Third-Party Defendant Reynolds Presto Products, Inc. (Presto), the manufacturer of the zippers used in the pouches. West Bend Mutual Insurance Company (West Bend), which is defending Reynolds under a reservation of rights, intervened seeking a determination that there is no coverage under its policy for any losses claimed and now moves for summary judgment. West Bend argues that because the undisputed material facts

establish that it has no duty to indemnify Reynolds for any of the damages claimed in the case, it likewise has no duty to defend Reynolds in this action. The court has jurisdiction over the claims pursuant to 28 U.S.C. § 1332. For the following reasons, West Bend's motion will be denied.

## BACKGROUND

In September 2022, Amcor hired Reynolds as a subcontractor to manufacture resealable, zipper pouches for its client, Trü Frü, a snack manufacturer that makes frozen berries covered in chocolate, among other things. Reynolds' Resp. to West Bend's Proposed Findings of Fact (PFOF) ¶ 1, Dkt. No. 57. Amcor provided Reynolds the film for the pouches, while Presto provided Reynolds the plastic material for the zippers. *Id.* ¶ 2. In December 2022, Reynolds shipped about 720,000 pouches to Trü Frü's copackers, Enfield Farms and Old Souls Farms. *Id.* ¶ 5. Personnel at Enfield Farms thereafter discovered contaminants in the pouches. *Id.* ¶ 6. The contaminants, which were plastic slivers or whisps commonly referred to as "angel hair," were determined to have originated from the zipper track of the pouches. *Id.* ¶¶ 7–9. Internal investigations determined that one of Reynolds' machines, the Hudson-Sharp, was responsible for making the angel hair during the manufacturing process. *See id.* ¶¶ 13, 18.

After discovery of the angel hair, Trü Frü elected to hold the Reynolds pouches that were produced on the Hudson-Sharp machine for inspection. *Id.* ¶¶ 28–29; *see also id.* ¶ 32. The hold applied to pouches that had already been filled with Trü Frü's frozen fruit products and were awaiting shipment, as well as pouches that had yet to be filled by Trü Frü's copackers. *Id.* ¶¶ 28–29. The angel hair did not impede the functionality of the pouches. Henry Dep. at 30, Dkt. No. 49-2. Nor was it toxic as it originated from food grade plastic that was safe for consumption. Dkt. No. 49-7 at 2. It was also determined, however, that in large enough quantities, the angel hair could potentially cause a choking hazard and that, to a lay person, it made the frozen berries look

2

moldy. Reynolds' Resp. to West Bend's PFOF ¶¶ 33–34. Ultimately, some 2,000 pallets of fruit filled pouches, as well as a quantity of unfilled pouches, were disposed of. *See id.* ¶ 31. Trü Frü then made a demand against Amcor for over $3 million to compensate Trü Frü for various expenses related to the angel hair ordeal, including the cost of discarded frozen fruit product. *See* West Bend's Resp. to Reynolds' Additional PFOF ¶ 1, Dkt. No. 60. Amcor in turn demanded the same of Reynolds, essentially seeking to pass on Trü Frü's claim. Reynolds' Resp. to West Bend's PFOF ¶ 36.

During the relevant time period, Reynolds was insured under a Commercial General Liability (CGL) Policy issued by West Bend. *Id.* ¶ 38; Policy, Dkt. No. 49-1. The policy contained general liability and errors and omissions liability coverage with a $1 million limit per occurrence or claim. *Id.* The relevant provisions of the policy will be set out in the court's analysis. Simply put, the question now before the court is whether any portion of Amcor's action against Reynolds potentially gives rise to coverage under the policy. If it does, West Bend has a duty to continue defending Reynolds in this litigation and possibly indemnify it down the road. If there is no potential coverage, West Bend has no duty to defend or indemnify Reynolds and would be entitled to dismissal from this lawsuit.

**LEGAL STANDARD**

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and

3

on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The parties agree that Wisconsin law governs this case. Under Wisconsin law, when the insurer is providing a defense, the question of coverage is analyzed on the full record, not just the complaint. *5 Walworth, LLC v. Engerman Contracting, Inc.*, 2023 WI 51, ¶ 13, 408 Wis. 2d 39, 992 N.W.2d 31 (citing *Est. of Sustache v. Am. Fam. Mut. Ins. Co.*, 2008 WI 87, ¶ 29, 311 Wis. 2d 548, 751 N.W.2d 845). In deciding whether an insurance policy provides coverage, the court must "examine the terms of the policy and compare it to the facts in the record." *Id.* ¶ 16.

The terms of an insurance policy are interpreted "not in isolation, but rather in the context of the policy as a whole." *Day v. Allstate Indem. Co.*, 2011 WI 24, ¶ 28, 332 Wis. 2d 571, 798 N.W.2d 199. Undefined words and phrases are given their common and ordinary meaning. *Id.* If words or phrases are susceptible to more than one reasonable construction, they are considered ambiguous and construed in favor of the insured since the insurer is the author of the policy. *Id.* Finally, "a basic canon of construction in Wisconsin is that exclusions in an insurance policy are narrowly construed against the insurer." *Id.* ¶ 29.

To reiterate, the question before the court is whether, if Amcor is successful in its action against Reynolds, any of Amcor's claims would "give rise to the possibility of coverage." *W. Bend Mut. Ins. Co. v. Ixthus Med. Supply, Inc.*, 2019 WI 19, ¶ 10, 385 Wis. 2d 580, 923 N.W.2d 550 (citation omitted). The analysis proceeds in three steps: "First, the court determines if the policy makes an initial grant of coverage. If so, the court examines the various exclusions to see whether any of them preclude coverage. Finally, should any exclusion apply, the court looks to see whether any exception to that exclusion reinstates coverage." *5 Walworth, LLC*, 408 Wis. 2d 39, ¶ 16. (cleaned up).

4

**ANALYSIS**

The court will focus on whether coverage exists under the policy's general liability provision. Because it finds that there is an initial grant of coverage, and an exclusion does not preclude coverage under the general liability provision, the court need not address whether there is coverage under the errors and omissions endorsement.

A.  **Step One: Initial Grant of Coverage**

Under the general liability provision of the Policy, West Bend "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Policy at 23. The policy "applies to 'bodily injury' and 'property damage' only if" it "is caused by an 'occurrence' that takes place in the coverage territory." *Id.* No bodily injury is alleged to have occurred here, so the threshold question is whether there was property damage caused by an occurrence to which the insurance applies. "Property Damage" means "physical injury to tangible property, including all resulting loss of use of that property . . . or loss of use of tangible property that is not physically injured." *Id.* at 37. An "occurrence," under the terms of the policy, is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* This language is standard across the insurance industry for CGL policies. *See Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805, 810 (7th Cir. 1992); *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 2009 WI 13, ¶ 3, 315 Wis. 2d 556, 759 N.W.2d 613.

Though "accident" is not defined in the policy, "Wisconsin courts have interpreted identical policy language many times." *5 Walworth, LLC*, 408 Wis. 2d 39, ¶ 34. "Generally, an 'accident' is 'an event or condition occurring by chance or arising from unknown or remote causes,' or 'an event which takes place without one's foresight or expectation.'" *Id.* (quoting *Am.*

5

*Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 37, 268 Wis. 2d 16, 673 N.W.2d 65). Putting it all together then, the policy provides coverage for sums that Reynolds becomes legally obligated to pay as damages because of a (1) physical injury to tangible property caused by an event or condition occurring by chance or arising from unknown or remote causes; or (2) loss of use of tangible property that is not physically injured caused by an event or condition occurring by chance or arising from unknown or remote causes.

The parties do not seem to dispute that the introduction and/or production of angel hair in the pouches manufactured by Reynolds was an "occurrence." That is, though Reynolds intentionally elected to use the Hudson-Sharp machine, the angel hair was the result of an unintended and unforeseen malfunction of that machine. *See Riverback Farms, LLC v. Saukville Feed Supplies, Inc.*, 2023 WI App 40, ¶ 17, 409 Wis. 2d 14, 995 N.W.2d 257 ("The focus is on whether the injury or damages was foreseeable or expected, not on whether the action that caused the damages was intended."). Instead, the parties' dispute centers on whether Amcor's claim against Reynolds is one for "property damage" within the meaning of the policy.

West Bend initially argues that Amcor's claim against Reynolds relates only to the costs to investigate the angel hair issue, sequester the defective product, and replace it with satisfactory product. So viewed, West Bend contends, the claim does not seek compensation for "property damage." But Amcor's claim is not so limited. West Bend itself recognizes that there is evidence in the record from which a reasonable jury could find that Trü Frü considered the pouches made with the Hudson-Sharp machine unusable and it disposed of a significant number of pouches that had been filled with its chocolate covered berries. There appears to be no dispute that "Tru Fru's demand to Amcor consisted of $3,305,845.94 for cost of scrapped product." West Bend's Resp. to Reynolds' Additional PFOF ¶ 1; *see also* Dkt. No. 49-6 (attaching to the Demand Letter from

Amcor to Reynolds an order form of the Trü Frü product that was rejected as contaminated); Henry Dep. at 35–36 (explaining the order form attached to the Demand Letter). And, as West Bend recognizes, Amcor's claim against Reynolds merely seeks to "pass on the claims of Trü Frü against Amcor." Reynolds' Resp. to West Bend's PFOF ¶ 36. In sum, it is clear that the damages at issue here include the cost of defective pouches containing angel hair *and* the discarded fruit product. The key question is whether the pouches and Trü Frü's fruit product were discarded on account of "property damage" as defined by the policy.

To repeat, the policy defines property damage in two ways, the first of which is "physical injury to tangible property, including all resulting loss of use of that property." Policy at 37. Wisconsin courts have held that this language is unambiguous and that "'physical injury' ordinarily refers to some sort of physical damage." *Wis. Label Corp. v. Northbrook Property & Cas. Ins. Co.*, 2000 WI 26, ¶ 31, 233 Wis. 2d 314, 607 N.W.2d 276. Or as the Seventh Circuit has stated, the plain meaning of "physical injury" is "a harmful change in appearance, shape, composition, or some other physical dimension of the 'injured' person or thing." *Eljer Mfg., Inc.*, 972 F.2d at 808–09. West Bend argues that there was no physical injury because the angel hair did not impair the functionality of the zipper pouches, nor were the berries in the filled pouches physically damaged by the angel hair or rendered inedible. In support of this argument, West Bend relies upon the testimony of Ms. Cherie Henry, Amcor's corporate designee on the issue of damages, who testified that the angel hair did not in any way injure or damage the pouches or make the fruit product inedible. Instead, as West Bend views it, the angel hair only aesthetically damaged the fruit product. Reynolds disagrees, noting that West Bend glosses over the fact that the angel hair caused the fruit product to look moldy and, in significant quantities, posed a choking

7

hazard. Thus, according to Reynolds, at least the fruit product, which is tangible property, was physically injured.

Reynolds' argument is persuasive. As a threshold matter, at least some of the "property" at issue is Trü Frü's fruit product. Because the duty to defend continues if any of the damages claimed may be covered, the question that first arises is whether the fruit product was physically injured and any argument concerning the functionality of the zipper pouches is irrelevant to that question. On the question of whether Trü Frü's fruit product suffered property damage, a brief recitation of relevant Wisconsin Supreme Court case law provides helpful guidance.

In *5 Walworth, LLC v. Engerman Contracting, Inc.*, a contractor negligently poured shotcrete and installed steel reinforcement rods, causing a pool to crack and leak. 408 Wis. 2d 39, ¶ 36. Those cracks and leaks then caused the surrounding soil to destabilize. *Id.* The court held the pool cracks and damage to surrounding soil was property damage under the contractor's CGL policy. *Id.* In *American Family Mutual Insurance Co. v. American Girl, Inc.*, negligent soil compression on the part of a subcontractor caused a warehouse building to sink, buckle, and crack. 268 Wis. 2d 16, ¶ 33. The court held the "sinking, buckling, and cracking" of the warehouse building qualified as "physical injury to tangible property" under the subcontractor's CGL policy. *Id.* In *Stuart v. Weisflog's Showroom Gallery, Inc.*, a contactor negligently constructed a hot tub/spa room leading to "rotted wood, warped windows, mold and mildew." 2008 WI 86, ¶ 7, 311 Wis. 2d 492, 753 N.W.2d 448. The court held that this qualified as property damage under the contractor's CGL policy. *Id.* ¶ 54. And in *Wilson Mutual Insurance Co. v. Falk*, a dairy farmer spread liquid manure on his field pursuant to a nutrient management plan, but the manure leeched into nearby residential wells rendering the "wells unusable and the water undrinkable." 2014 WI 136, ¶ 6, 360 Wis. 2d 67, 857 N.W.2d 156. The court held that the seepage of the manure into the

8

wells was property damage under the farmer's CGL policy. *Id.* ¶ 32. On the other hand, in *Wisconsin Label Corp.*, the court held that when a manufacturer mislabeled retail goods leading to those goods being sold below their intended price, there was no property damage to the goods under the manufacturer's CGL policy. *Wis. Label Corp.*, 233 Wis. 2d 314, ¶ 31.

In light of the holdings in these cases, a jury could find from the evidence in this case that there was property damage to Trü Frü's fruit product. True enough, the angel hair did not cause the fruit product's chemical composition to change like the manure did to the well water in *Wilson Mutual*. 360 Wis. 2d 67, ¶¶ 49–51; *see also Wis. Label Corp.*, 2000 WI 26, ¶ 31 ("Labeling could conceivably result in physical injury to tangible property, if, for instance, a caustic adhesive burned through the packaging and actually injured the product."). Nor did it change the fruit products' size or cause the chocolate coating to crack or peel away. *See Ferrell v. W. Bend Mut. Ins. Co.*, 393 F.3d 786, 795 (8th Cir. 2005) (applying Wisconsin law and holding that tomato plants that were stunted, undersized, sunburned, waterlogged, and/or cracked in parts were physically injured). But it is clear that the angel hair changed some physical dimension of the food product; namely, its appearance. The record reflects that the angel hair caused some of the fruit product to appear moldy. That is, the angel hair physically adhered to the fruit product as depicted in the left and middle panes of the image below:



9

Case 1:23-cv-01306-WCG   Filed 11/04/25   Page 9 of 14   Document 80

Dkt. No. 49-5 at 6. Unlike the facts in *Wisconsin Label Corp.*, there was physical damage of a sort to the retail product; it was not simply mislabeled. *See* 233 Wis. 2d 314, ¶ 32.

It is also of no moment that the angel hair was made of food grade material and therefore safe for human consumption. The fact that it may have been safe for human consumption does not mean it could be sold for human consumption. An appearance of mold on the product would naturally cause most consumers to reject it. The old adage "the eyes eat first" is even more fitting here than it was in *Decker Plastics Corp. v. West Bend Mutual Insurance Co.* 880 F.3d 1017, 1019 (8th Cir. 2018) (affirming the trial court's decision that landscaping material—sand and rock— was not physically injured when the plastic bag it was stored in deteriorated, infiltrating the landscaping material with shreds of plastic). Moreover, the record also reflects that in some instances there was enough angel hair to potentially pose a choking hazard. Thus, a jury could conclude that at least some of the fruit product was physically damaged in such a way that it was no longer salable. Alternatively, evidence that a significant accumulation of angel hair in a pouch could create a choking hazard would justify a finding that product packaged in such pouches was no longer fit for human consumption and thus suffered a loss of use as a consumer snack food.

In sum, a reasonable jury could find based on the evidence before the court that the accidental introduction of angel hair caused physical injury to Trü Frü's fruit product. In other words, a jury could find from the evidence that at least some of the damages Amcor seeks fall within the initial grant of coverage provided by West Bend's policy.

**B.  Steps Two and Three: Exclusions and Exceptions**

Having concluded that there is evidence from which a jury could find property damage caused by an occurrence, the court must now consider whether any exclusions would remove such coverage. As noted above, courts narrowly construe exclusions against the insurer. *Frost ex rel.*

*Anderson v. Whitbeck*, 2002 WI 129, ¶ 19, 257 Wis. 2d 80, 654 N.W.2d 225. If an exclusion does apply, the court will then consider whether an exception reinstates coverage. West Bend argues that two exclusions remove coverage here: the "Contractual Liability" exclusion and the "Recall Of Products, Work Or Impaired Property" exclusion. Policy at 24, 27. The court will consider each in turn.

The "Contractual Liability" exclusion provides that "[t]his insurance does not apply to . . . '[b]odily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." Policy at 24. In *American Girl*, the Wisconsin Supreme Court explained this exclusion is not meant to exclude coverage "for any and all liabilities to which the insured is exposed under the terms of the contracts it makes generally." 268 Wis. 2d 16, ¶ 58. This is because "[r]eading the phrase to apply to all liabilities sounding in contract renders the term 'assumption' superfluous." *Id.* The court held instead that "the contractually-assumed liability exclusion applies where the insured has contractually assumed the liability of a third party, as in an indemnification or hold harmless agreement." *Id.*; *see also Saft Am., Inc. v. Precision Drawn Metals, Inc.*, No. 21-CV-35-JDP, 2022 WL 3444883, at *7 (W.D. Wis. Aug. 17, 2022) ("In other words, the exclusion isn't triggered simply because a claim is based on a breach of contract. Rather, [the insurer] must show that [the insured] is responsible for the damages at issue because [it] assumed the liability of a third party.").

In light of its plain language and the court's decision in *American Girl*, the exclusion has some application here. Reynolds agreed to indemnify a third-party, Amcor. Dkt. No. 1-2 at 1 ("[Reynolds] shall indemnify and hold harmless [Amcor] . . . from and against any and all claims, damages, losses and expenses . . . arising out of or resulting from: (i) [Reynolds'] and its subcontractor's performance . . . or breach of this purchase order."). Properly understood, this is

11

a case where Amcor is, at least in part, seeking compensation for Trü Frü's damages which arise from Reynolds' performance. Accordingly, the exclusion would seem to apply. *Cf. Am. Girl, Inc.*, 268 Wis. 2d 16, ¶ 62; *United Co-op. v. Frontier FS Co-op.*, 2007 WI App 197, ¶ 34, 304 Wis. 2d 750, 738 N.W.2d 578; *Saft Am., Inc.*, 2022 WL 3444883, at *7 ("Saft's claimed damages for lost production aren't based on an indemnity agreement or the claim of a third party. Rather, Saft is seeking compensation for its *own* damages based on Precision's alleged failure to comply with its obligation to provide nondefective steel cans."). Reynolds must therefore show that an exception to the exclusion reinstates coverage.

Reynolds argues that the first exception, which states that "[t]his exclusion does not apply to liability for damages . . . [t]hat the insured would have in the absence of the contract or agreement," applies. Policy at 24. In particular, Reynolds asserts that Amcor could have brought an equitable indemnification claim to recover the damages at issue, or Trü Frü could have brought a negligence action directly against it rather than Amcor. West Bend's response to this argument is perfunctory, citing no authority that an equitable indemnification claim would be unavailable to Amcor. In any event, the court concludes that Amcor would be able to pursue an equitable indemnification claim against Reynolds absent the contractual indemnification provision; and therefore, the exception applies. *See Est. of Kriefall v. Sizzler USA Franchise, Inc.*, 2012 WI 70, ¶¶ 34, 41, 342 Wis. 2d 29, 816 N.W.2d 853 ("Indemnification can arise by contract or it can be based on equitable principles. . . . Equitable indemnification seeks to shift the burden of payment to the party who, in equity, should pay." (citing *Greenlee v. Rainbow Auction/Realty Co., Inc.*, 582 N.W.2d 93, 96 n.4 (Wis. Ct. App. 1998)). And because the exception to the contractual liability exclusion applies, coverage is not excluded thereby.

West Bend also asserts that coverage is excluded under the "Recall Of Products, Work Or Impaired Property" exclusion. That exclusion removes coverage for:

> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
> 1. "Your product";
> 2. "Your work"; or
> 3. "Impaired property";
>
> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Policy at 27. The parties do not dispute that the pouches qualify as Reynolds' product. Accordingly, West Bend argues that the exclusion applies because the pouches were removed from the market because they were defective. This is true, but as the court concluded above, the damages at issue here also include compensation for physical injury to Trü Frü's fruit product. Reynolds thus argues that the damages claimed for the loss of use of Trü Frü's fruit product are not reached by the exclusion. West Bend disagrees, contending that Trü Frü's fruit product qualifies as "impaired property" and therefore still falls within the exclusion.

"Impaired property" is defined as "tangible property, other than 'your product' or 'your work', that cannot be used or is less useful because . . . [i]t incorporates 'your product' or 'your work' that is known or thought to be defective, inadequate or dangerous[.]" *Id.* at 35. Importantly, however, the policy further states that property that cannot be "restored to use by the repair, replacement, adjustment or removal of 'your product' or 'your work'" is not "impaired property." *Id.* Citing this limitation, Reynolds argues that "[l]ogic and common sense indicate it would be very unlikely that fruit adulterated with plastic shreds could be 'processed' to assure every piece of plastic is removed such that it is safe for human consumption." Br. in Opp. at 14, Dkt. No. 56. West Bend's only response is that Reynolds has not produced any evidence from which a

13

reasonable jury could conclude that the fruit product could be repaired. But West Bend is the party moving for summary judgment. The burden is on West Bend to establish based on undisputed evidence that the exclusion precludes coverage. *Day*, 332 Wis. 2d 571, ¶ 26. West Bend has failed to do so. West Bend does not point to any evidence in the record that would suggest that Trü Frü's fruit product could have been restored. Based on the evidence submitted by the parties, it appears a reasonable jury could infer that repair of the fruit product was not economically feasible. *See Decker*, 880 F.3d at 1017 (observing that contaminating plastic shreds could not be economically removed). It thus follows that West Bend is not entitled to summary judgment based on the applicability of the "Recall Of Products, Work Or Impaired Property" exclusion.

## CONCLUSION

A reasonable jury could conclude that the CGL policy issued to Reynolds by West Bend provides coverage for at least a portion of Amcor's claims against Reynolds. Further, West Bend has not shown that an exclusion removes coverage as a matter of law. Therefore, West Bend must continue to defend Reynolds. Notably, however, this determination has no bearing on whether West Bend will ultimately be required to indemnify Reynolds. *See Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶ 20, 261 Wis. 2d 4, 660 N.W.2d 666. For these reasons, West Bend's motion for summary judgment (Dkt. No. 46) is **DENIED**.

**SO ORDERED** at Green Bay, Wisconsin this 4th day of November, 2025.

William C. Griesbach
United States District Judge